GIBSON, DUNN & CRUTCHER LLP
ERIC D. VANDEVELDE, SBN 240699
    evandevelde@gibsondunn.com
ILISSA SAMPLIN, SBN 314018
    isamplin@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GIBSON, DUNN & CRUTCHER LLP
JOSEPH A. GORMAN, SBN 267553
    jgorman@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Plaintiff Scale AI, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Scale AI, Inc.,<br><br>          Plaintiff,<br><br>   v.<br><br>Mercor.io Corporation and Eugene Ling,<br><br>          Defendants. | Case No.: 3:25-cv-07402<br><br>**COMPLAINT FOR:**<br>**1.  MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836, *et seq.*)**<br>**2.  BREACH OF CONTRACT**<br>**DEMAND FOR JURY TRIAL**<br>**INJUNCTIVE RELIEF SOUGHT** |

Gibson, Dunn &
Crutcher LLP

COMPLAINT

Plaintiff Scale AI, Inc. ("Scale"), by way of this Complaint against Defendants Mercor.io Corporation ("Mercor") and Eugene Ling (together, "Defendants"), states and alleges as follows:

## INTRODUCTION

1.    Scale brings this action against its former employee, Eugene Ling, and his new employer, Mercor, to address their theft of Scale's trade secrets and proprietary business information. As a small and new competitor vying for a share of the market, Mercor sought to bypass the time and investment required to develop its own business strategies by illicitly acquiring those of Scale, the industry leader.  In the weeks leading up to his departure, Mr. Ling stole more than 100 confidential documents concerning Scale's customer strategies and other proprietary information.  The following key facts, which are based on only limited forensics available to Scale, expose Mr. Ling and Mercor's coordinated and unlawful efforts:

- A significant portion of the stolen documents relate to a client ("Customer A") that Mercor had failed to win over on its own.  Mercor recruited Mr. Ling specifically to expand its relationship with this customer.  While still employed at Scale, Mr. Ling met with Mercor's CEO.  The very next day, Mr. Ling dramatically increased his downloads of confidential Scale documents, particularly those for Customer A.

- Mercor, including Mercor's President, engaged with Mr. Ling in discussions about other Scale business strategies and products while Mr. Ling was still employed at Scale, including Scale's proprietary "off-the-shelf" ("OTS") data packs and rubrics.  Mr. Ling stole documents related to those topics, as well.

- While still employed at Scale, Mr. Ling contacted Customer A on behalf of Mercor.  Mr. Ling told a Customer A employee that he was "really excited about [how] this new company can support you" and asked if Customer A was "working with Mercor already," to which the employee responded, "Let's talk on the call 🤓".

- Mr. Ling, through his lawyer, has since admitted to taking these documents, and maintaining possession today.

COMPLAINT

Gibson, Dunn & Crutcher LLP

- Mercor, through its lawyer, has also conceded Mr. Ling took these documents after initially denying it and yet Mercor continues to staff him on the Customer A account, relying on the very trade secrets he stole.

As a result, Scale is seeking the Court's assistance.

2.     Scale is an artificial intelligence company that has helped power numerous AI breakthroughs over the past decade.  Mr. Ling most recently served as Scale's Head of Engagement Management, a role in which he was responsible for the company's delivery efforts with its client, Customer A.  In June 2025, Mr. Ling began exploring new job opportunities, and around the same time, he started downloading confidential documents relating to Scale's business and customers.

3.     As his conversations with Mercor, a small and new entrant into the GenAI industry, increased, Mr. Ling began downloading a higher volume of documents specific to Customer A.  He also took confidential documents relating to other customers (herein referred to as Customers B, C, D, E, and F) and proprietary strategy documents concerning Scale's rubrics and OTS data packs, all while discussing via text message Mercor's need for these offerings.  Forensic evidence shows that Mr. Ling downloaded these documents from Scale's Google Drive (the "Scale Drive") and then transferred them to his personal Google Drive (the "Ling Drive") so that he would have them available when he no longer worked at Scale.  Forensic evidence indicates that he transferred the documents in three ways: (i) uploaded the downloaded documents to the Ling Drive, (ii) dragged-and-dropped documents from the Scale Drive to the Ling Drive, and (iii) copied and pasted documents from the Scale Drive to the folders on the Ling Drive.  Collectively, the stolen documents amount to a roadmap for unfairly competing with Scale on particular customer projects.

4.     In a very competitive market, Mercor is vying for the same limited pool of customers, including Customer A.  On information and belief, Mercor has not invested in the same robust research and development as Scale, and could use insider knowledge of Scale's superior technology and data strategy to keep pace in the market.  Mercor's recruitment of Mr. Ling was primarily driven by its desire to expand its relationship with Customer A.  Mr. Ling's meetings and conversations with Mercor's CEO and President confirmed that his value was tied to his visibility into Scale's strategy and its relationship with Customer A.  On information and belief, Mercor offered Mr. Ling a commission

structure to bring over more business from Customer A.  Forensic evidence shows that on the day after he met with Mercor's CEO, Mr. Ling significantly increased his downloads of Customer A related documents.  In a separate instance, Mr. Ling also had conversations with Mercor's President about developing strategies for Mercor's OTS product, while simultaneously downloading documents related to that product.  Additional forensic evidence shows that Mr. Ling was already pitching Mercor to Customer A before he even began at the company, and while he was still employed by Scale:

| | |
|---|---|
| Mr. Ling: | Hey [Customer A employee]! How are you doing |
| … | |
| Customer A Employee: | Are you reaching out as Scale-Eugene, Free-Agent-Eugene, or some other form of Eugene? |
| … | |
| Mr. Ling: | I'm reaching out as Free-Agent Eugene 😛 |
| … | |
| Mr. Ling: | … I'm staying within the data space and I'm actually really excited about [how] this new company can support you |
| … | |
| Customer A Employee: | You founded a new company? Or do you mean Mercor? ;) |
| … | |
| Mr. Ling: | Are you working with Mercor already? |
| Customer A Employee: | Let's talk on the call 🤓 |

5.      The forensic evidence currently available to Scale demonstrates that Defendants' plan was to improperly use Scale's confidential and proprietary information to replicate Scale's operations and business at Mercor and to unlawfully divert work from some of Scale's top customers, including Customer A.  In particular, the currently available evidence reveals the following unlawful behavior:

- ***June 11: Competitor Outreach & GenAI Document Theft.***  In early June, Mr. Ling began interviewing with Scale's competitors, telling them over text that he was "open to exploring new opportunities."  At the same time, he began downloading numerous confidential and

Gibson, Dunn & Crutcher LLP

proprietary documents from the Scale Drive, including nearly 40 documents on one day (June 11) relating to Scale's GenAI business and overall company strategy. This was a massive increase in downloading activity for Mr. Ling, given that he rarely needed to download documents to accomplish his work. Forensic evidence indicates that on that same day, he set up folders on the personal Ling Drive that match the names and types of the documents downloaded, such as "Work," "Scale AI," "Spec Docs," "MLDG Reports," "Scale Decks," and other folders with specific Scale-project names, where, on information and belief, he dragged and dropped the downloaded documents.

- ***June 26–July 9: Mercor Interview & Customer Strategy Document Theft.*** Mr. Ling interviewed with Mercor on June 26, and continued talking to Mercor and other competitors over the next few weeks. On July 9, Mr. Ling downloaded five proprietary documents, each reflecting Scale's account strategy for five of its top customers (Customers B, C, D, E, and F). Forensic evidence indicates that on that same day, Mr. Ling created a folder on the Ling Drive called "Strategy Docs," into which, on information and belief, he dragged and dropped the five strategy documents he had just improperly downloaded. Mr. Ling had no legitimate business reason to download these documents—he did not work on the accounts for Customers B, C, D, E, and F at Scale—and he certainly had no reason to relocate them to the personal drive he could have continued to access after he left Scale.

- ***July 13–14: Mercor CEO In-Person Meeting & Customer A Document Theft.*** On the evening of July 13, Mr. Ling met in person with the CEO of Mercor in Palo Alto. The next morning (and continuing throughout that day), he downloaded nearly a dozen strategic documents relating to Customer A, and forensics show that he transferred at least some of those documents to the Ling Drive. For instance, the morning after he met with Mercor's CEO, Mr. Ling downloaded a document entitled "[Customer A] 2025 Q3 Account Strategy.docx" from the Scale Drive and later uploaded that document to the Ling Drive.

- ***July 15: Document Theft Continues.*** On July 15, Mr. Ling downloaded more than 15 additional proprietary documents and transferred at least some of them to the Ling Drive. For instance, he downloaded "SSOT Agent Completion (V3)." In addition, he created a folder on

the Ling Drive titled "Agent Completion," where, on information and belief, he dragged and dropped "SSOT Agent Completion (V3)" and additional proprietary Scale documents.

- ***July 17: Mr. Ling Gives Departure Notice to Scale.*** Mr. Ling notified his manager that he is leaving Scale. At the same time, he continued to download at least one document related to Scale's OTS strategy.

- ***July 18: OTS Strategy Documents.*** On his last day at Scale, Mr. Ling texted with Mercor's President and Mercor employees about his upcoming work at Mercor. He asked whether Mercor "have data packs / off the shelf [OTS]? That will be a quick win." After the Mercor employee told Mr. Ling that Mercor had "some finance rubric OTS sets," Mr. Ling said that he and Mercor would "definitely need more Hahaa." Mr. Ling said he and Mercor would need to be able to "create sellable data packs ASAP," because "everyone else" (i.e., competitors of Mercor) "has it and it's very helpful for margins + quick wins for customers." These are among the documents Mr. Ling downloaded—without permission or any reason related to his work responsibilities at Scale—during his final week at Scale, including on his second-to-last day. These exchanges concerning "rubrics" occurred shortly after Mr. Ling downloaded a rubrics strategy document from the Scale Drive.

- ***July 18: More Customer A Documents.*** In addition, on his last day at Scale, Mr. Ling reached out to a contact at Customer A directly to discuss how his "new company can support you." Less than two hours later, Mr. Ling texted a Mercor employee and Mercor's President about his discussion with Customer A. For example, Mr. Ling told Mercor's President:

"I just spoke with some folks over there. Their vision is very aligned with that of Mercor's. They had a negative experience before with Mercor – but want to give Mercor another shot and they are excited to work with me."

The stolen documents include some of Scale's most highly confidential and proprietary materials reflecting Scale's superior data strategy and operations. There is no legitimate explanation for Mr. Ling's misconduct, which not only violates federal trade secret law, but also basic aspects of his

employment agreements with Scale, including his contractual duty of loyalty to Scale and his duty not to compete with Scale while it employed him.

6.     On information and belief, Mercor's plan is to use the confidential and proprietary documents Mr. Ling stole to reignite its relationship with Customer A.  Mr. Ling stands to receive a significant benefit from this arrangement.  While Mr. Ling did not receive a commission-based package at Scale, Mercor, on information and belief, offered him one.  Mr. Ling accordingly had a large monetary incentive to bring more Customer A work to Mercor, given that the Customer A relationship is worth millions of dollars to Mercor.  Scale will be irreparably harmed if Mercor is permitted to use Scale's confidential and trade secret information to unfairly and unlawfully compete for Scale's business.  Scale appreciates that employees have every right to move companies—including to a competitor—and that competitors have every right to compete for business.  Scale welcomes competition.  But trade secret theft is unlawful and indefensible.  Employees have no right to take Scale's confidential and proprietary information with them as they walk out the door, and competitors have no right to use that information to unfairly compete.  This is a direct affront and threat to Scale's business.

7.     Scale immediately contacted Mercor and Mr. Ling after Scale discovered Mr. Ling's theft.  Mercor's response has only validated and heightened Scale's concerns.  After initially denying that Mr. Ling had stolen documents, and only after confronted with the findings of Scale's preliminary forensic analysis, Mercor's counsel conceded that Mr. Ling put the stolen Scale documents onto the Ling Drive and is still in possession of them.  Mercor's counsel refused to provide a full list of the documents that Mr. Ling stole, and also confirmed that Mr. Ling is working for Mercor for the very same customer (Customer A) to which many of the documents he stole from Scale relate.  Yet Mercor has refused to even temporarily suspend Mr. Ling from working on the Customer A account until this dispute is resolved, choosing instead to continue unjustly enriching itself each day Mr. Ling services Customer A while in possession of Scale's proprietary information.  Scale needs the Court's assistance to prevent Mr. Ling and Mercor from continuing to profit from Mr. Ling's theft, to Scale's detriment.

COMPLAINT

Gibson, Dunn & Crutcher LLP

## THE PARTIES, JURISDICTION, AND VENUE

8.    Scale AI, Inc. is a California corporation with its principal place of business in San Francisco, California.  It was incorporated in 2016.

9.    Eugene Ling is an individual who at all times relevant herein was employed and/or conducted business in San Francisco, California.  On information and belief, Mr. Ling resides in San Francisco, California.

10.    Mercor.io Corporation is a Delaware corporation with its principal place of business in San Francisco, California.  It was incorporated in 2023.

11.    The Court has jurisdiction in this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims pleaded herein pursuant to 28 U.S.C. § 1367.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Scale's and Mercor's principal places of business are in this District and Mr. Ling is a resident in this District, such that all parties are subject to general jurisdiction in this District.  In addition, a substantial part of the events or omissions giving rise to the claims pleaded herein took place in this District.  Specifically, Scale is headquartered in this District and Mr. Ling worked for Scale at their San Francisco offices.  Moreover, Mr. Ling agreed to, and executed, contracts with Scale, which he breached in this District.

13.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c) and General Order No. 44, because this action is an intellectual property action, it is properly assigned to any of the divisions in this District and is subject to assignment on a district-wide basis.

## FACTS

### A.    Overview of Scale

14.    Scale offers a variety of products that help build, deploy, and evaluate AI, including products that focus on combining AI tools with human experience to improve the quality of data used to train AI models.  Scale is an AI industry leader that partners with the world's largest and most sophisticated technology companies and public institutions, including the United States Department of Defense.  Formed in 2016, Scale now has more than 1,000 employees and is headquartered in San

Gibson, Dunn &
Crutcher LLP

Francisco, California.  In June 2025, Scale was named one of the 100 most influential companies in the world by *Time* magazine.

15.    Scale has several parts of its business.  First, its Data Engine improves training data quality by combining AI tools and human expertise for generative AI.  Second, Scale's GenAI Platform helps traditional enterprises securely customize models and build AI applications with their own data.  Scale Donovan supports public sector clients by enabling rapid analysis of large datasets, helping users like Naval officers and intelligence analysts uncover insights faster.  And finally, Scale leads in Test & Evaluation, providing unbiased AI research, model rankings, and open-source tools to promote AI safety and security.

16.    Through its Data Engine, Scale delivers high-quality data for leading enterprise and public-sector customers and partners to use in their advanced AI applications.  Scale's customers and partners include the world's leading frontier labs and model builders.

17.    Many projects at Scale begin with a customer seeking to improve its advanced AI application in a particular way—for example, to train it to provide more accurate and useful responses on a particular subject.  On these sorts of projects, Scale invests significant time and resources to design proprietary, complex prompts and parameters.  This process ensures the efficient production of data tailored to that customer's unique model and needs.

18.    Another important way that Scale provides high-quality and useful data for its customers is by anticipating what data its customers will want in the future through "off-the-shelf" or "OTS" data packs.  Scale does this by investing in specific data sets based on its confidential and proprietary analysis of whether there will be future demand for that data for several customers.  Scale's decision about what data to pre-invest in is based on the extensive research and experience of a team of Scale machine learning researchers.  With data packs, Scale's goal is to be able to offer the data to multiple customers "off the shelf" (OTS) as opposed to in response to one specific customer's request.  This data and Scale's ability to anticipate customer demand is worth tens of millions of dollars to the company.  Development of those tools and products requires extensive trial and error, and involves anticipating not just *what* the customers will want, but *how* to develop that data to deliver it to them in the most useful manner.

COMPLAINT

Gibson, Dunn & Crutcher LLP

**B.    Scale Safeguards the Secrecy of Its Confidential and Proprietary Information**

19.    Scale's confidential and proprietary information gives it a substantial competitive edge over its existing and would-be competitors.  To protect the competitive advantage that information confers on Scale's business, Scale takes extensive measures to ensure the secrecy of its trade secrets. These security measures include requiring employees to (1) agree to a confidentiality agreement before commencing employment and employee handbook during new hire onboarding, (2) undergo security training on an annual basis, (3) abide by Scale's robust technical safeguards, and (4) follow Scale's exit process upon departure from the company.

**1.    Employees Must Agree to Scale's Confidentiality Agreement and Employee Handbook Before Commencing Employment**

20.    Before commencing employment, all Scale employees must review and sign an offer letter that sets forth the general terms of the parties' relationship.  The offer letter expressly imposes a duty of loyalty on employees, and provides that employees may not compete, or help others compete, with Scale while employed with the company.  It also requires employees to agree to the Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"), copies of which are attached to this Complaint as Exhibits A and B, as a condition of employment.

21.    The Confidentiality Agreement governs employees' access to and obligations with respect to "Confidential Information," which is defined as "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties."  Ex. A at 2–3; Ex. B at 2.  Confidential Information includes (but is not limited to) "technical data, trade secrets, know-how, research, product or service ideas or plans, … agreements with third parties, lists of[] or information relating to[] employees and consultants of the Company (including … the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of[] or information relating to[] suppliers and customers (including … customers of the Company on whom [the employee] called or with whom [the employee] became acquainted during the Relationship)," price lists and methodologies, market share data and market plans, "contract information, business plans, financial forecasts, historical financial

data, budgets," and "other business information disclosed to [the employee] by the Company either directly or indirectly." Ex. A at 2–3; Ex. B at 2.

22.    The Confidentiality Agreement requires employees to hold Scale's Confidential Information in strictest confidence, and precludes employees from disclosing and making copies of that information during and after the term of the employment relationship.  The agreement states:

> I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information …, without which I would not be able to perform my duties to the Company.  ***I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information*** that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  ***I further agree not to make copies of such Confidential Information except as authorized by the Company***.

Ex. A at 2 (emphases added); Ex. B at 2.

23.    The Confidentiality Agreement also precludes employees from using Scale's Confidential Information to solicit employees or clients on behalf of a competitor, both during and after the term of the employment relationship.  Ex. A at 6; Ex. B at 5.

24.    Scale employees also are required to agree to the Employee Handbook when they onboard and it is posted and easily available internally.  The Handbook stresses Scale's commitment to protecting the company's confidential and proprietary information, requires employees to hold all confidential and proprietary information in strict confidence, and precludes employees from accessing, using, or disclosing Scale's confidential and proprietary information other than to perform their assigned duties.   The Handbook expressly prohibits employees from sending confidential and proprietary information outside the organization, and from copying company information onto non-Scale systems (i.e., emailing company records to a personal email address).

**2.    Employees Must Undergo Security Training on an Annual Basis**

25.     Employees are required to reaffirm their commitment to protecting Scale's confidential and proprietary information throughout their employment.  For instance, all Scale employees must uphold the company's Code of Ethics and Business Conduct, which expressly states that protecting

confidential and proprietary information belonging to the company and its employees, customers, and business partners is integral to Scale's business success.

26.     Scale employees also undergo security training when they join the company, which must then be renewed every year. These trainings cover Scale's numerous policies and guidelines governing employees' proper access to and use of Scale's confidential and proprietary information, as well as Scale's policies and guidelines concerning the proper storage, handling, and transfer of such information to customers, vendors, and independent contractors. For example, employees are reminded not to share confidential and proprietary information (including the identity of customers) with independent contractors, and instructed that vendors must sign non-disclosure agreements, complete security questionnaires, and implement technical and organizational security measures before being onboarded.

**3.      Employees Must Abide by Scale's Robust Technical Safeguards**

27.     Scale has implemented robust technical measures to protect its confidential and proprietary information. For example, Scale uses: (a) full disk encryption, two-factor authentication, and single-sign on authentication to ensure only authorized users have access to company systems, (b) mobile device management software that allows IT administrators to remotely monitor, manage, and secure employee devices, (c) firewalls to monitor and control incoming and outgoing network traffic, (d) an endpoint detection and response solution to detect and prevent cyber threats, and (e) data distribution service software to facilitate secure data sharing between applications and hardware, and prohibit the transfer of data onto storage devices, such as USB drives. In addition to implementing these security measures, Scale monitors and logs activity across its networks and systems to ensure that confidential and proprietary information is not improperly accessed or shared outside the company.

28.     Scale also requires employees to notify the company and receive approval to use company devices abroad and then follow certain policies and guidelines governing their access to company systems and documents while abroad.

29.     Scale also restricts access to company documents stored on Scale's Google Drive ("Scale Drive"). For instance, employees may not access documents stored on the Scale Drive that they did not create unless they are granted permission to do so. Nearly all work done on Scale

documents is performed on the Scale Drive itself.  There is rarely any reason for Scale employees to download any documents from the Scale Drive onto their work laptop, aside from occasionally sending client-facing materials to customers that are unable to access materials stored on a Google Drive.  And there is no reason, and indeed it would be improper, for an employee to download documents from the Scale Drive and then transfer them to the employee's personal Google Drive.  The Confidentiality Agreement expressly prohibits such conduct, and Scale maintains download logs so that unusual downloading activity can be monitored and detected.

**4.      Employees Must Follow Scale's Exit Process Before Departing the Company**

30.      Scale also conducts an exit process for each departing employee to ensure that its confidential and proprietary information is returned and that the employee remembers and complies with their confidentiality obligations.

31.      For instance, departing employees are reminded that they are prohibited from copying, downloading, transferring, emailing, or taking Scale's confidential and proprietary information, or otherwise using or disclosing such information after their employment with Scale concludes.

32.      Departing employees also are required to return all company property, and asked to sign a "Termination Certificate," which certifies that they: (a) have complied with all the terms of the Confidentiality Agreement, (b) have returned all information and property belonging to Scale, (c) will preserve the confidentiality of Scale's Confidential Information, (d) will not use Scale's Confidential Information to solicit Scale employees or clients away from Scale and to a competitor.  Ex. A at 13; Ex. B at 9–10.

**C.      Eugene Ling's Employment with Scale**

33.      Mr. Ling began working at Scale in September 2019 as a Customer Program Manager. He left Scale in February 2021 for a position at another company and was rehired by Scale in November 2023 as an Engagement Manager.

34.      Each time Mr. Ling joined the company, he signed his offer letter and the accompanying Confidentiality Agreement.  *See* Ex. A; Ex. B.  As stated above, those agreements imposed an express duty of loyalty upon Mr. Ling, required Mr. Ling to preserve the confidentiality of Scale's confidential

and proprietary information, and prohibited Mr. Ling from using Scale's confidential and proprietary information to solicit employees or clients on behalf of a competitor like Mercor.

35.     In his role as an Engagement Manager, Mr. Ling was tasked with managing and developing certain of Scale's most important customer relationships, including "Customer A," which accounts for many million dollars of annual revenue for Scale.  In that role, Mr. Ling worked closely with numerous individuals at Scale to collectively deliver high-quality data for Customer A to use in their advanced AI applications.  In addition to developing and executing data projects to address issues identified by clients in their advanced AI applications, Mr. Ling also had access to extensive OTS data scripts and projects worth tens of millions of dollars developed through extensive trial and error, designed by teams at Scale to anticipate not only what customers will want, but also effective mechanisms to provide it to them efficiently.

36.     In April 2025, Mr. Ling was promoted to Head of Engagement Management—taking on a more expansive role and working more closely with Customer A as the most senior dedicated Scale engagement manager.

**D.     Mr. Ling Pursues Employment with Scale's Competitors—Including Mercor—and Misappropriates Scale Confidential and Trade Secret Information**

37.     Beginning in early June 2025 and continuing through July 2025, Mr. Ling engaged with several of Scale's competitors for a new position.  In these discussions, on information and belief, Mr. Ling discussed commission-based compensation structures, whereby engagement managers receive significant cash incentives for customer accounts they bring to or expand for the company.  On information and belief, Mercor offered to pay Mr. Ling 20% of the gross profits that Mercor generated from customer projects that Mr. Ling brought to the company, after Mr. Ling had brought in more than $5 million in gross profits.  This compensation structure provided a powerful financial incentive for Mr. Ling to join one of these competitors and take Scale work with him.

38.     Also, throughout June and July 2025—just as he was pursuing employment opportunities with Scale's competitors—Mr. Ling downloaded a large number of Scale's most highly confidential and proprietary materials, and then transferred such documents to the Ling Drive.  These materials included extremely sensitive and valuable proprietary information about Scale's clients

COMPLAINT

(including Customers A, B, C, D, E, and F) and Scale's business and operational strategies to serve those clients' needs. They also included invaluable and marketable work product created by Scale to complete critical projects for those clients—as well as OTS work product completed to efficiently fulfil future anticipated needs—all of which numerous individuals at Scale had developed over significant periods of time and at great expense. Scale's preliminary forensic examination of Mr. Ling's Scale laptop, returned upon his departure from the company, revealed that a significant portion of this theft occurred in the *hours and days* following Mr. Ling's in-person meeting with the CEO of Mercor, while he was employed by Scale. Neither Mr. Ling's mass downloading campaign nor his meeting with Mercor's CEO had anything to do with Mr. Ling's duties and obligations to Scale, but instead were done to help Scale's direct competitor—Mercor—replicate Scale's business and operations so that it could divert work from some of Scale's top customers.

39.     Based on the facts of which Scale is currently aware, the timeline of Mr. Ling's conduct demonstrates a pattern and willful intent to steal Scale's confidential materials in the days and weeks leading up to his final day at Scale, largely beginning in early June when he was discussing job opportunities outside of Scale. For instance, on June 13, 2025, Mr. Ling wrote to an individual at another company that he was "very much open to exploring new opportunities." Mr. Ling subsequently confirmed to his contact at that company that he "wanted to broadly share that [he'll] be poking around," even "if there isn't a fit yet at [that company]."

40.     On June 11 and 12, 2025, forensics show that Mr. Ling downloaded a large amount of Scale confidential and proprietary materials from the Scale Drive and began accessing those same materials on his personal drive (the Ling Drive) shortly thereafter, meaning those documents were likely uploaded to the Ling Drive. Also on June 11, forensic evidence indicates that Mr. Ling created a series of folders on the Ling Drive that related to his work at Scale, such as "Scale AI," "Work," "Spec Docs," "MLDG Reports," "Important," "Scale Decks," "Samples," "Final i18n RLHF," and other folders that relate to specific Scale project names. On information and belief, these folders were created on the Ling Drive to house the documents that Mr. Ling had downloaded from the Scale Drive.

41.     On June 26, 2025, Mr. Ling met in person with several employees of Mercor at Mercor's office in San Francisco. Mercor is one of Scale's competitors that, on information and belief, offers a

commission-based compensation structure for certain roles.  Mercor is a small, more recent market entrant and, on information and belief, has not invested in the robust internal research and development efforts that would enable it to competently manage and complete large projects for major clients in the advanced AI applications space, including for an organization like Customer A.  On information and belief, it also has not invested in research required to produce competitive OTS materials.

42.    On June 27, 2025, Mr. Ling texted an employee at Mercor asking if he was "free to catch up," and confirming that Mr. Ling had "recently chatted with [Mercor's President and another Mercor employee] about" Mercor.

43.    On July 9, 2025, Mr. Ling downloaded five proprietary documents from the Scale Drive and then, on information and belief, dragged and dropped them into a folder on the Ling Drive.  These documents reflected Scale's account strategy for five of its six top customers (Customers B, C, D, E, and F), and are entitled: (i) "[Customer B] July 2025 Q3 Account Strategy"; (ii) "[INTERNAL] [Customer C]: 2025 Q3 Account Strategy"; (iii) "[Internal] [Customer D] Account Plan"; (iv) "[Internal] [Customer E] Account Plan"; (v) "[Customer F] 2025 Q3 Account Strategy – WIP." Forensic evidence indicates that *on that same day*, Mr. Ling created a folder on the Ling Drive called "Strategy Docs," into which, on information and belief, he dragged and dropped the five strategy documents he had downloaded that day.  Mr. Ling had no business reason to download these documents—he did not work on the accounts for Customers B, C, D, E, and F at Scale—and he certainly had no reason to relocate them onto his personal drive.  On information and belief, Mercor began making pitches to certain of these customers around the same time Mr. Ling departed Scale regarding the very same topics covered in the stolen documents relating to that customer.

44.    A few days later, on the evening of July 13, 2025, Mr. Ling met in person with Mercor's CEO in Palo Alto, California.  Following this meeting, Mr. Ling's document downloads from Scale's network became much more focused on Customer A—a customer Mercor had struggled to gain traction with—and Scale's overall strategy.  The *morning after* he met with Mercor's CEO, Mr. Ling downloaded and immediately saved more proprietary material, including a document entitled "[Customer A] 2025 Q3 Account Strategy.docx," along with several other Customer A specific documents.  The 2025 Q3 account strategy document, in particular, relates to Scale's overall data

COMPLAINT

strategy for Customer A, and provides a highly detailed and technical roadmap for replicating the proprietary work Scale performs for Customer A. That same day, Mr. Ling downloaded *more* highly detailed and technical Scale work product for Customer A from the Scale Drive, including "SSOT [Customer A] Audio [workstream].docx." Mr. Ling then uploaded that document to the Ling Drive. This document reflects confidential Scale-owned organizational, process, and design materials for an important customer project completed for Customer A. On information and belief, Mr. Ling was being recruited to move Customer A work from Scale to Mercor.

45.    On July 15, 2025, a Mercor employee texted Mr. Ling: "Just heard the news …, congrats! Super excited to work together." That same day, Mr. Ling downloaded *more* highly detailed and technical Scale work product from the Scale Drive, including a confidential Scale document called "SSOT Agent Completion (V3)." Mr. Ling had no business reason to download these documents at all, let alone upload them to the Ling Drive after he had decided to join a competitor.

46.    Also on July 14 and 15, a forensic examination shows that Mr. Ling had both the Scale Drive and Ling Drive open at the same time, with Scale documents regarding Customer A appearing in both drives at the same time, suggesting they had been copied and pasted from one drive to the other. In other instances, Mr. Ling had both drives open at the same time, with forensic activity indicating that he was copying information from one document on the Scale Drive to another document on the Ling Drive. Mr. Ling had no legitimate reason to download, copy, or remove these documents or their contents from Scale at any time, let alone as he was preparing to walk out the door for a competitor.

47.    On July 17, 2025, Mr. Ling signed an offer letter of employment from Mercor. He texted multiple Mercor employees that day, letting them know he had "signed and committed" to Mercor. This same day, Mr. Ling downloaded from the Scale Drive yet another proprietary strategy document for Customer A, entitled "[Customer A] – Scale's Coding Data Streams June 2025." This document is an internal strategy document for Customer A, meaning it reflected significant research and development resources as Scale worked to meet Customer A's demands, and detailed (after extensive trial and error) an executable blueprint for developing and delivering in the most useful manner the data necessary to satisfy Customer A's demands. The stolen information also contained

internal Scale strategy on rubrics and OTS data—two topics Mr. Ling discussed with Mercor the next day.

48.     On July 18, 2025—while still employed at Scale and during business hours—Mr. Ling had multiple conversations with employees at Customer A about the fact that he was going to work at Mercor. On information and belief, in at least one instance, he discussed with a Customer A employee how Mr. Ling's "new company can support" Customer A. He relayed those conversations to multiple employees at Mercor—again, while still employed at Scale. Specifically, Mr. Ling told Mercor's President and another Mercor employee in separate conversations that he had just spoken "with some folks over there" at Customer A, including "a few researchers" who had called and texted him. He stated that Customer A had not been interested in working with Mercor after having had a bad experience with the company—which is unsurprising, given that Mercor has not invested the time and significant financial resources that an entity like Customer A would require. However, Mr. Ling stated that, following Mr. Ling's conversation with Customer A (and after Mr. Ling had downloaded invaluable Customer A materials from Scale), Customer A was now willing "to give Mercor another shot." In at least one forensically recovered conversation with a Customer A employee, Eugene Ling stated he was not reaching out as "Scale-Eugene" but rather as "Free-Agent-Eugene." And even though he was, at the time, working for Scale, Mr. Ling asked if Customer A was "working with Mercor already," to which the Customer A Employee responded, "Let's talk on the call 🤯".

49.     In addition, Mr. Ling explained to Mercor employees what types of documents Mercor needed both to win customers and to anticipate customer demand—again, while still employed at Scale. For instance, Mr. Ling stated that Mercor would need "to start with managed services, nail quality on rubrics, and then transition to experts work," and asked: "Does Mercor have data packs / off the shelf [OTS]? That will be a quick win." After a Mercor employee let Mr. Ling know that Mercor had "some finance rubric OTS sets," Mr. Ling said that he and Mercor would "definitely need more Hahaa." Mr. Ling said he and Mercor would need to be able to "create sellable data packs ASAP," because "everyone else" (i.e., competitors of Mercor) "has it and it's very helpful for margins + quick wins for customers." That same day, Mr. Ling downloaded yet more confidential material from the Scale Drive.

Gibson, Dunn & Crutcher LLP

50.     Also, on July 18, 2025—while still employed at Scale and during business hours—Mr. Ling sent text messages attempting to recruit additional Scale employees to join Mercor.  He texted Mercor's President:  "just a heads up, [named Scale employee] is an amazing ops leader."  "He would be my first pick in terms of bringing folks from scale over.  I called him and it seems like he is doing an onsite next Wednesday."

51.     In addition, during his last hours at Scale on July 18, 2025, Mr. Ling requested access to a document relating to Customer C, to which he did not have access because he did not work on the Customer C account.  The document lays out Scale's tasks, goals, timeline, and status for various ongoing projects for Customer C.  Upon receiving the request, a Scale employee responded: "What is this, some last day shenanigans?"  Mr. Ling had no business reason to be accessing this document, let alone on his last day at Scale after formally accepting an offer at Mercor.

52.     Mr. Ling's employment with Scale terminated at the end of the day on July 18, 2025.

53.     Notably, Mr. Ling did not sign his "Termination Certificate" upon his departure, and therefore did not certify that he:  (a) had complied with all the terms of the Confidentiality Agreement, (b) have returned all information and property belonging to Scale, (c) will preserve the confidentiality of Scale's Confidential Information, and (d) will not use Scale's Confidential Information to solicit Scale employees or clients away from Scale and to a competitor.

54.     Mercor's counsel claims that Mr. Ling formally began his employment with Mercor on August 4, 2025.

55.     Mr. Ling is one of several Scale employees that were recruited by Mercor in the summer of 2025.  Scale Employee A interviewed with Mercor on June 28, 2025, and accepted an offer to join Mercor in early July 2025.  On July 26, 2025, Mr. Ling introduced Scale Employee B—an employee who worked primarily on Customer A and had access to proprietary information regarding Customer A—to Mr. Ling's contact at Mercor via email.  This introduction led to an onsite visit for Employee B at Mercor, and Employee B subsequently accepted an offer of employment with Mercor in early August 2025.  Mr. Ling targeted Employee B due to his relationship with Customer A.  Like Mr. Ling, Employee B worked on delivery efforts for Customer A at Scale, and Scale's proprietary strategy was valuable to Mercor as it attempted to expand its relationship with Customer A.

Gibson, Dunn & Crutcher LLP

**E.    Mr. Ling's Conduct Risks Irreparable Harm to Scale**

56.    The documents Mr. Ling stole and still has while working at Mercor include many of Scale's most confidential and proprietary documents.  Collectively, they amount to a clear roadmap for unfairly competing with Scale for particular customers on particular projects.  They include documents containing proprietary information relating to Scale's work with numerous customers, including Customers A, B, C, D, E, and F, detailing account strategy, customer meetings, customer proposals, customer projects, as well as documents detailing Scale's insights and intellectual property around model weak points, project automation, and competitive insights.

57.    For example, Mr. Ling downloaded, with no legitimate reason to do so, proprietary Scale account strategy documents for five of Scale's largest customer accounts (Customers B, C, D, E, and F), and forensics indicate that on that same day he created a folder on the Ling Drive called "Strategy Docs" into which, on information and belief, he dragged and dropped those documents:  (i) "[Customer B] July 2025 Q3 Account Strategy"; (ii) "[INTERNAL] [Customer C]: 2025 Q3 Account Strategy"; (iii) "[Internal] [Customer D] Account Plan"; (iv) "[Internal] [Customer E] Account Plan"; and (v) "[Customer F] 2025 Q3 Account Strategy – WIP."

58.    These documents detail extensive market research produced by Scale to determine information including, but not limited to: (1) the overall budget of the customer to use data providers to train its advanced AI; (2) the market share of that budget Scale and other competitors are able to obtain; (3) known and projected (through intensive research and analysis) needs and priorities for the customer in the short, medium, and long term; (4) internal strategies to direct Scale's resources, including its largescale research and development projects (such as OTS efforts), to grow Scale's market share going forward for the customer, and out-perform Scale's competitors in services; (5) individuals at the customer (which are enormous institutions) who Scale believes will be most receptive to particular Scale tools and products; and (6) specific product lines in the works to address clients known and anticipated needs going forward, including operational information, Scale intellectual property, and strategies for pitching those product lines.

59.    As another example, Mr. Ling stole a proprietary document entitled "SSOT Agent Completion (V3)," which is a complete internal running log of how Scale designed a critical project

for a client. The document includes information provided by the customer that was used to begin to develop the project, technical specifications regarding Scale's successful efforts to develop the project to accomplish the customer's needs, all of the operational and technical processes deployed to complete the project, and recent customer feedback on the project. Documents like this one would be incredibly valuable to a new competitor like Mercor. First, they would provide insight into a large customer's projected and actual internal needs and Scale's strategies and technical approach to satisfy those needs. Second, they serve as a roadmap for Mercor to begin servicing similar requests by the same or similar clients going forward.

60.    Many of the stolen documents—including Scale's account strategy documents and its OTS documents—also contain detailed information about Scale's most nascent tools and products that are still in early development. Those documents show what approaches Scale used in developing (or in beginning to develop) those tools, what worked and did not work (i.e., negative know-how), and where Scale strategically intends to take future development. They reflect not only *what* Scale believes the future demand will be, but *how* Scale is working to meet that future demand (referred to as "rubrics"), as well as how Scale has effectively delivered on tools/products previously.

61.    In short, Mr. Ling stole documents reflecting what strategies Scale is focused on for the future, how Scale intends to implement those strategies, how Scale should price its products to meet customer budgets, and who at the customer Scale intends to pitch those products to. Mr. Ling also stole specific and confidential work product for nearly all of Scale's largest customers, providing detailed roadmaps for Mercor to duplicate Scale's work for the exact same customers going forward. Defendants' misappropriation imminently threatens Scale's relationships with not just Customer A, but also Customers B, C, D, E, and F, as well as other current and prospective customers. In addition to direct revenue, Scale receives valuable feedback and data from its customers, and losing those relationships would irreversibly damage Scale's ability to develop and improve its products. Due to customer stickiness in rapidly emerging fields like AI, Scale may never be able to recover its customer relationships if they are lost.

COMPLAINT

Gibson, Dunn & Crutcher LLP

62.     If Mr. Ling and Mercor were able to make use of these Scale documents to unfairly and unlawfully compete against Scale, they would gain an improper head start in developing and selling products to Scale's customers.

63.     Furthermore, by proceeding to pass off Scale's work as its own, and/or using Scale's work as a model for projects going forward, Defendants also threaten to irreparably damage Scale's hard-earned reputation as a pioneer in the GenAI industry.

64.     Defendants' use of Scale's confidential and proprietary information for future expected additional pitches, proposals, and product development activities threatens imminent and irreversible disclosure, diminution of the value of Scale's trade secrets, and further misappropriation of Scale's confidential and proprietary information.

65.     In addition, Mercor and Mr. Ling are using Scale's confidential and proprietary information to identify and target certain Scale employees to work for Mercor.  This includes, without limitation, confidential, non-public details concerning the work performed by certain Scale employees and their performance at Scale, the composition and structure of Scale's team and accounts, the identity of specific accounts on which Scale employees have worked, the proprietary data and intellectual property to which those employees have access, and how such information could be deployed to unjustly confer a competitive advantage to Mercor.

**F.     Mercor and Mr. Ling Have Not Been Forthcoming in Efforts to Resolve this Dispute Pre-Litigation**

66.     After discovering Mr. Ling's theft, Scale contacted Mr. Ling, beginning on August 7, 2025, resulting in a weeks-long exchange of correspondence with Mercor's counsel.  In an effort to try and resolve this dispute out of Court, Scale attempted to obtain meaningful assurances on an expedited time frame.  But the ensuing letter exchange only heightened Scale's serious concerns.  More and more disturbing and contradicting facts came to light, and Scale continued to get the run around from Mercor and Mr. Ling, whose intent appears to be to delay and obfuscate, rather than cooperate with Scale to resolve this dispute.

67.     Mercor and Mr. Ling have not been forthcoming about *whether* Scale documents are in Mr. Ling's possession (much less which documents).  At first, they denied that Mr. Ling has such

documents.  Only after they were confronted with the results of Scale's initial forensic examination did they admit that Mr. Ling still has Scale documents in his possession.  Specifically, in its initial August 7 letter, Scale explained its concerns that Mr. Ling had been using Scale confidential and proprietary information in violation of the Confidentiality Agreement, and requested a list of the Scale documents still in his possession as well as details about any acquisition, disclosure, or use of those documents.  On August 13, Mr. Ling and Mercor's counsel (who also represents Employee A and Employee B) responded dismissively to Scale's concerns.  They did not provide a list of Scale documents in Mr. Ling's possession.  Instead, they suggested that no such documents exist, stating that Mercor "has no basis to believe" that Mr. Ling, Employee A, or Employee B (collectively referred to as the "Former Employees") "have used or disclosed information" in violation of their agreements with Scale, and that the Former Employees "confirm they have and will continue to abide by" their agreements with Scale.  Those representations were false.  Scale advised Mercor in its August 14 letter that a preliminary forensic examination of Mr. Ling's work laptop showed that he had removed proprietary documents in the weeks and days leading up to his departure from Scale.  *Only then*, after being confronted with forensic proof, did Mercor's counsel *admit* on August 18 that "Mr. Ling is in possession of certain documents from his time as an employee at Scale."  But despite weeks of asking, Mercor and Mr. Ling still have not provided a list of those documents, or any additional information about them.

68.     Mercor and Mr. Ling also have not been forthcoming about whether (and to what extent) Mr. Ling is working on the Customer A account or whether he will stop working on that account until this matter is resolved, which would be appropriate under these circumstances.  Specifically, after discovering that Mr. Ling stole an alarming number of proprietary documents relating to Customers A, C, D, E, and F, Scale asked Mercor's counsel to confirm (i) whether Mr. Ling was working for Customers A, C, D, E, and F, and (ii) whether Mercor had placed Mr. Ling on administrative leave pending resolution of this matter.  Mercor's counsel refused to answer whether Mercor had placed Mr. Ling on administrative leave, stating that the issue is a "personnel matter" and Scale was not entitled to know the answer.  However, during an August 26 phone call, Mercor's counsel confirmed that Mr. Ling *had been working on the Customer A account at Mercor*, as Scale feared.  But to this day, Mercor has refused to even temporarily suspend Mr. Ling from working on that account.  That is inexplicable,

as Mr. Ling joined Mercor just weeks ago, has Scale's confidential documents relating to Customer A in his possession, and text messages reveal that Customer A had not been interested in working with Mercor before Mr. Ling joined the company.  Mercor's counsel stated that Mr. Ling is not using Scale's confidential documents in connection with his work for Customer A, but has refused to provide a satisfactory explanation for that assurance.  This confirmation rings hollow, of course, because (i) Mercor falsely stated in earlier correspondence that Mr. Ling had abided by his agreements with Scale (which prohibit him from retaining Scale's confidential information); (ii) Mr. Ling indisputably misappropriated Scale's confidential documents and the sole fact that he told his employer's lawyer that he is not using those documents is not a meaningful assurance; and (iii) although Employees A and B provided sworn declarations to Scale (which themselves are deficient and do not provide meaningful assurances), Mr. Ling *did not provide a declaration despite having the opportunity to do so*.  Moreover, even if Mercor's counsel's representations were accepted at face value, they raise even more questions.  Mercor's counsel assured Scale that Mr. Ling had not accessed Scale's confidential documents *since receiving Scale's initial letter* (sent on August 7), which makes no logical sense since Mr. Ling denied having the documents until August 15.

69.    Mercor and Mr. Ling also have sought to hide the full extent of their theft and cause further delay through their illusory offer to conduct a forensic examination of only some of Mr. Ling's devices.  In its August 27 letter, Scale requested that Mercor retain a forensic expert to create complete images of Mr. Ling's devices and accounts, as well as the Mercor devices, accounts, and systems to which he had access—including, but not limited to, laptop(s), hard drive(s), cloud accounts, Google Drive, mobile devices, and tablets.  Mercor's counsel responded that Mercor and Mr. Ling were prepared to have Mr. Ling provide a forensic examiner "access to his personal Google Drive," and to have the forensic examiner "make an image of Mr. Ling's impounded work laptop."  But that response only exacerbated Scale's concerns that Mercor and Mr. Ling are continuing to benefit from the acknowledged theft of Scale's trade secrets.  Indeed, Mercor's counsel did not offer to conduct a forensic examination of all of Mr. Ling's personal accounts (including any Gmail or other cloud email or storage account), any of Mr. Ling's personal devices (including his phone and any personal laptop, desktop, tablet, external media storage, or other device), or any Mercor devices, accounts, or systems

to which Mr. Ling has access beyond his work laptop—to which Mr. Ling could have transferred the stolen documents, including before August 7, given that he concedes he did not stop accessing them until that date.

70.     Scale's exchange with counsel for Mercor and Mr. Ling leaves many critical questions unanswered, including what Scale documents Mr. Ling has in his possession, whether he accessed or used them while employed by Mercor or for Mercor's benefit, whether he is or will use them in connection with his ongoing work for Customer A, and where else those documents might reside and the identity of any persons or companies with which they were shared.  Mercor and Mr. Ling's conduct has left Scale no choice but to seek the Court's assistance.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Federal Trade Secret Misappropriation**
**Under the Defend Trade Secrets Act (against all Defendants)**
**18 U.S.C. § 1836,** *et seq.*

71.     Each of the foregoing paragraphs is incorporated into this First Cause of Action, as if set forth herein.

72.     As discussed above, Mr. Ling improperly acquired possession of more than 100 documents containing Scale's most prized trade secrets.  Mr. Ling misappropriated Scale's trade secrets when he downloaded confidential and proprietary documents from the Scale Drive and then immediately uploaded those documents to the Ling Drive.  He also downloaded trade secrets from the Scale Drive and then, on information and belief, dragged and dropped them into a "Strategy Docs" folder on the Ling Drive.  And he copied and pasted trade secrets from the Scale Drive to the Ling Drive when he had both the Scale Drive and Ling Drive open at the same time and the documents appeared in both drives.  Mr. Ling committed this brazen theft without authorization from Scale and without any legitimate business purpose.  On information and belief, Mr. Ling intends to use those documents at Mercor to unlawfully and unfairly compete against Scale for customers, including Customers A, B, C, D, E, and F.  Mr. Ling still has improper possession of Scale's trade secrets to this day and continues to work on the Customer A account at Mercor for the benefit of Mercor.

73.     Mr. Ling misappropriated Scale's trade secrets when, on information and belief, he disclosed Scale's trade secrets to Mercor.

74.     Both Mr. Ling and Mercor misappropriated Scale's trade secrets when, on information and belief, they used those documents to gain a head start in developing products and tools for customers, including Customers A, B, C, D, E, and F.

75.     Mercor is also vicariously liable for Mr. Ling's misappropriation under the doctrine of respondeat superior given that, on information and belief, Mr. Ling committed the misappropriation within the scope of his employment and the terms of his forthcoming employment with Mercor.  Mr. Ling misappropriated Scale's trade secrets for the benefit of Mercor.  He misappropriated those trade secrets after he had decided to leave Scale for Mercor and/or after he had formally signed his agreement to work with Mercor.  He told Mercor on July 18 that Mercor "definitely need[s]" more OTS data packs, and misappropriated documents relating to OTS data packs with, on information and belief, the intent to use them at Mercor and for the benefit of Mercor.

76.     On information and belief, if Mr. Ling and Mercor are not enjoined, they will continue to access, use, disclose, or otherwise misappropriate Scale's trade secrets to benefit themselves and to unlawfully compete with Scale.

77.     On information and belief, Defendants' misappropriation has caused and continues to cause substantial injury to Scale's business, including, but not limited to, actual damages, lost profits, harm to its reputation, and the diminution of the value of its trade secrets.  On information and belief, Defendants have been unjustly enriched by their misappropriation of Scale's trade secrets.

78.     Scale owns the trade secrets misappropriated by Defendants.  Scale compiled them after many years of hard work and significant financial investment, as referenced in Paragraphs 14–18, 38–47, 56–65.  They derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use, as referenced in Paragraphs 14–18, 38–47, 56–65.

79.     Scale has taken reasonable efforts to preserve the confidentiality of its trade secrets.  Those measures include requiring employees to agree to confidentiality agreements and the employee

handbook, undergo security trainings, and comply with Scale's robust technical safeguards, as well as the other measures outlined above at Paragraphs 19–32.

80.    Scale therefore seeks preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of its trade secret documents and information and to remedy injury to Scale's business interests and reputation.  Scale will continue to suffer irreparable harm absent the requested injunctive relief.

81.    Scale also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

82.    On information and belief, Defendants misappropriated Scale's trade secrets for an improper purpose and in a willful and malicious manner.  Scale therefore seeks exemplary damages up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION
### Breach of Contract (against Mr. Ling)

83.    Each of the foregoing paragraphs is incorporated into this Second Cause of Action, as if set forth herein.

84.    Mr. Ling breached his contracts and agreements with Scale, including his 2023 offer letter and accompanying Confidentiality Agreement.  These agreements are valid and enforceable contracts, intended to protect Scale's legitimate business interests, that Mr. Ling was required to sign in exchange for his employment and compensation.

85.    Mr. Ling breached his contracts with Scale by using, copying, downloading, transferring, and disclosing Scale's confidential and proprietary information in the days before his departure from the company, and by failing to return Scale's confidential and proprietary information upon his departure.  As discussed throughout this Complaint, Mr. Ling downloaded various confidential and proprietary documents from the Scale Drive and then immediately uploaded those documents to the Ling Drive.  He also downloaded documents from the Scale Drive and then, on information and belief, dragged and dropped them into a "Strategy Docs" folder on the Ling Drive. And he copied and pasted documents from the Scale Drive to the Ling Drive when he had both the

Scale Drive and Ling Drive open at the same time and the documents appeared in both drives. Mr. Ling committed this brazen theft without authorization from Scale and without any legitimate business purpose, and in breach of his contractual obligation to hold Scale's confidential and proprietary information in the strictest confidence and to return such information upon termination.

86.     Mr. Ling also breached his contracts with Scale by using Scale's confidential and proprietary information to help Mercor—Scale's direct competitor—compete with Scale and solicit Customer A while Mr. Ling was still employed by Scale. Mr. Ling's conduct breached his express contractual duty of loyalty to Scale, as well as the contractual provision precluding him from using Scale's confidential and proprietary information to help a third-party compete with Scale and solicit clients while still employed by Scale.

87.     Scale has performed all its duties under all such contracts.

88.     Scale has been injured and will continue to be injured by Mr. Ling's breaches of his agreements with Scale in an amount which cannot be readily ascertained or compensated by money damages.

89.     As a direct and proximate result of Mr. Ling's breach of his contracts, Scale has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, Scale is entitled to injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Scale prays for judgment in its favor and against Defendants Mercor and Eugene Ling, as follows:

A.     For preliminary and permanent injunctive relief against Defendants, including enjoining Mr. Ling from violating his legal and contractual duties to Scale, enjoining Defendants from accessing, using, disclosing, or otherwise misappropriating Scale's confidential and trade secret documents and information, and directing Defendants to return all of Scale's confidential and trade secret documents and information in their possession, custody, or control;

B.     For damages, including exemplary damages, as described above in each of the causes of action;

C.    For costs, attorneys' fees, and other expenses incurred in this action;

D.    For pre-judgment and post-judgment interest; and

E.    For such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Scale respectfully requests a jury trial on all claims for relief.

DATED:  September 3, 2025                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Eric D. Vandevelde*
       Eric D. Vandevelde
       Ilissa S. Samplin
       Joseph A. Gorman

*Attorneys for Plaintiff Scale AI, Inc.*